UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| EUPHRATES BEAN,<br>    Plaintiff,<br><br>    v.<br><br>MELVIN JOHNSON, *et al.*,<br>    Defendants. | Case No. 1:21-cv-1013-MSN-IDD |

MEMORANDUM OPINION

This matter comes before the Court on defendant Melvin Johnson's Motion to Dismiss [Dkt. No. 22] filed February 11, 2022. As previously addressed by the Court in its order dated March 23, 2022, Johnson submitted a substantial amount of evidence with his motion. [*See* Dkt. Nos. 23, 29]. The Court will consider this evidence and treat the motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d) and 56. The Court instructed plaintiff of its intention in this regard and provided him with an opportunity to submit evidence in opposition. [Dkt. No. 29]. Plaintiff has failed to avail himself of this opportunity.[1] Because the window for plaintiff to reply has closed, the Court considers the motion fully briefed and ready for adjudication. For the following reasons, the motion will be granted, and judgment will enter in favor of defendant.

I.  **Background**

Plaintiff alleges in this action that, on an unspecified date in 2019, he was shot in the leg and taken to Sentara Norfolk General Hospital for treatment. Am. Compl. [Dkt. No. 12]. He was released from the facility on August 31, 2019 and told to "keep the gunshot wound dry and redress

---

[1] Although the order informing plaintiff of the Court's intent to treat the motion as one for summary judgment was initially returned to the courthouse as undeliverable, [*see* Dkt. No. 31], the Court sent a new copy of the order to plaintiff at the address he recently provided [*see* Dkt. No. 32]. The order was not returned as undeliverable; accordingly, the Court operates under the presumption that it was received by plaintiff.

it every 12 hours to prevent infection." *Id.* The complaint implies without explicitly stating that plaintiff was then taken to Norfolk City Jail, where Johnson was working as a medical doctor. It alleges that, upon plaintiff's arrival at the jail, "Dr. Johnson ignored [plaintiff's] request to" clean his wound every twelve hours and failed to provide plaintiff a wheelchair, shower chair, or waterproof bandages. *Id.* Plaintiff was allegedly "forced to sleep on a floor bunk" or "the top tier of a 3 tierd [sic] bunk" because "[t]he doctor refused to issue [him] a bottom bunk pass." *Id.* As a result of defendant's alleged failures, plaintiff suffered "exacerbated [] P.T.S.D., anxiety, and depression," for which an increased dosage of medication was required. *Id.*

## II. Undisputed Facts

After exhaustive examination of the record and as set forth below, the Court finds certain facts to be undisputed. *Cf. Apedjinou v. Inova Health Care Servs.*, Case No. 1:18-cv-00287, 2018 WL 11269174, at *1 (E.D. Va. Dec. 19, 2018) ("The nonmovant's failure to respond to a fact listed by the movant or to cite to admissible record evidence constitutes an admission that the fact is undisputed."); *Cincinnati Ins. Co. v. Am. Glass Indus.*, Case No. 1:07-cv-1133, 2008 WL 4642228, at *1 (E.D. Va. Oct. 15, 2008) ("the Court assumes that facts alleged in the motion for summary judgment are admitted unless controverted by the responding opposition brief") (internal quotations omitted). The Court's review of the record reveals the following undisputed facts:

1. On August 29, 2019, plaintiff was admitted to Sentara Norfolk General Hospital with a self-inflicted gunshot wound to his left thigh. [Dkt. No. 23-1] at 9. Plaintiff was discharged from the hospital on August 31, 2019, at which point he was "Afebrile, Ambulating, Eating, Drinking, Voiding," had "acceptable" "pain control," and was overall deemed "stable." [Dkt. No. 23-1] at 21.

2. Plaintiff was brought to Norfolk City Jail following his release from the hospital. That same day, medical personnel at the jail assessed plaintiff and prepared a "Receiving Screening" form which noted plaintiff's gunshot wound, P.T.S.D. diagnosis, and the care plan scheduled for him. *Id.* at 27. The form indicated that plaintiff should be placed in "Medical Observation Housing." *Id.* at 34. Another form entitled "Identification of Special Needs" indicated that plaintiff should be provided a bottom bunk. *Id.* at 41. Johnson did not conduct plaintiff's initial assessment but was present in the room while other medical personnel did so. *Id.*

3. Plaintiff was next seen on September 3, 2019, by Licensed Practical Nurse ("LPN") Nancy Brulet. *Id.* at 51. Nurse Brulet provided plaintiff with Bactrim, an antibiotic, and naproxen, a pain reliever. *Id.* The nurse examined and measured plaintiff's gunshot wound, cleansed the area, packed the wound with "approx. 2 feet of 1/4 iodoform," and covered the injury with "an ABD pad [] secured with silk tape." *Id.* The following day, LPN Kimberly Boone examined plaintiff. *Id.* at 52. Nurse Boone again provided plaintiff Bactrim and naproxen, examined and cleaned plaintiff's wound, and "packed [it] with almost 5 yards of iodoform covered with abd pad." *Id.* Nurse Boone repeated this process the next day—September 5, 2019. *Id.* at 53.

4. On September 6, 2019, an unknown medical officer met with plaintiff to provide him wound care. *Id.* at 92. The provider noted that plaintiff's wound dressing was "saturated" and accordingly cleansed the wound, provided an "iodoform pack," and covered the wound. *Id.*

5. On September 9, 2019, plaintiff was seen by Nurse Practitioner ("NP") Susan Anderson. *Id.* at 54–56. NP Anderson provided plaintiff with Bactrim and naproxen and treated plaintiff's wound. *Id.* Specifically, she "[i]rrigated [the] wound [with] sterile saline, applied slight pressure to express saline, packed [it with] aqua cell ribbon, covered [it with] Eluxtra, NAD, secured [it with] hypofix [and] Tegaderm (to allow a shower)." *Id.*

3

6.     On September 10, 2019, plaintiff was seen by LPN Alliyah Gaston. *Id.* at 57–58. Nurse Gaston provided plaintiff with Bactrim, naproxen, and a "Daily Multi-Vitamin tablet." *Id.* She also "irrigated and cleaned" plaintiff's wound, then "packed [it] with ribboned aquacel then covered [it] with Telfa." *Id.* She noted that plaintiff tolerated the procedure well and "walked with [a] steady gait out of clinic." *Id.*

7.     On September 11, 2019, plaintiff was seen by LPN Mariah Morris. *Id.* at 59–60. Nurse Morris provided plaintiff with Bactrim, naproxen, and a "Daily Multi-Vitamin tablet." *Id.* She then "cleansed . . . and drained [plaintiff's gunshot wound]" before packing and covering it once more. *Id.*

8.     On September 12, 2019, plaintiff was seen again by Nurse Boone. *Id.* at 61–62. Nurse Boone provided plaintiff with Bactrim, naproxen, a multi-vitamin, buspirone, Celexa, and Abilify. *Id.* Because plaintiff's wound dressing was "intact [with] minimal drainage to the dressing," medical personnel did not change plaintiff's dressing. Instead, medical personnel would assess the wound the following day. *Id.*

9.     On September 13, 2019, Kamilah Dukes—who is listed as "Supervisory Staff" on the relevant health report—saw plaintiff for "wound care." *Id.* at 65–66. Dukes provided plaintiff with Bactrim, naproxen, a multi-vitamin, buspirone, Celexa, Abilify, and Lotrimin cream. *Id.* Dukes measured plaintiff's wound, "rinsed and cleansed" the area, repacked the wound with an "Aquacel strip," covered the wound, and secured a bandage. *Id.*

10.    On September 16, 23, and 26, 2019, plaintiff was seen by NP Susan Anderson. *Id.* at 68, 69, 71, 72. NP Anderson provided plaintiff with Bactrim, naproxen, a multi-vitamin, buspirone, Celexa, Abilify, and Lotrimin cream. *Id.* NP Anderson observed and cleansed plaintiff's wound before repacking and covering it. *Id.*

4

11. On September 28, 2019, plaintiff was seen by LPN Boone. *Id.* at 73. Boone provided plaintiff with a multi-vitamin, buspirone, Celexa, and Abilify. *Id.* Boone cleaned plaintiff's gunshot wound, packed the wound with "aquacell ribbon," and dressed and covered the site with "tegaderm." *Id.* at 74.

12. On October 1, 2019, plaintiff was seen by an unknown medical provider. *Id.* at 77. The provider observed and cleaned plaintiff's wound before packing and covering it. *Id.* That same day, plaintiff was transferred out of Norfolk City Jail. *Id.* at 96.

13. Throughout the time plaintiff was held at Norfolk City Jail, defendant did not personally treat or assess plaintiff. [Dkt. No. 23-1] at 5. He did, however, approve plaintiff's medication. *Id.*

### III. Standard of Review

As stated above, the Court will consider the evidence submitted by defendant with his motion. Accordingly, the Motion will be treated as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d), 56.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). Once the moving party has met its burden to show that it is entitled to judgment as a matter of law, the nonmoving party "must show that there is a genuine dispute of material fact for trial . . . by offering sufficient proof in the form of admissible evidence." *Id.* (quoting *Guessous v. Fairview Prop. Inv'rs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences from those facts in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

IV.   **Analysis**

Before challenging the merits of plaintiff's suit, Johnson argues that plaintiff's complaint is barred by the relevant statute of limitations. The Court declines to address this argument but finds that the record at summary judgment nevertheless shows that defendant is entitled to judgment in his favor.

As an initial matter, there is no dispute that Johnson never saw or treated plaintiff directly. Materials submitted in support of the motion reflect that although Johnson was in the room at the time plaintiff's wound was first assessed at Norfolk City Jail, he was not responsible for treating plaintiff while plaintiff he was incarcerated there. It is also undisputed that plaintiff affirmatively received treatment from several health care providers, including NP Anderson and LPNs Brulet, Gaston, Morris and Boone.[2]

Despite the parties' agreement that plaintiff received his medical care from professionals other than Johnson, plaintiff argues that defendant owed him a "duty of care arising out of the special relationship of doctor and patient, and the duty of care vicariously imposed by the doctrine of respondeat superior." [Dkt. No. 26] at 3. The duty of care standard applies in negligence or medical malpractice suits, not federal Section 1983 claims. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Salgado v. Mitchell*, No. 3:09-2796-JFA-JRM, 2010 WL 297665, at *1 (D.S.C. Jan. 20, 2010) ("[T]o the extent plaintiff is alleging negligence and/or medical malpractice in this action, such claims are not cognizable under Section 1983.").

---

[2] It is unclear from the record whether Kamilah Dukes was a healthcare provider.

Nor, to the extent plaintiff argues Johnson should be held liable as the supervisor of individuals who actually treated him, does plaintiff possess any viable claim. A supervisory liability claim consists of three elements: (1) a supervisor's knowledge that his or her subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) a response showing "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) an "affirmative causal link" between the supervisor's inaction and the constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks and citations omitted). Here, the Court can discern no evidence which would support this claim.

Lastly, to the extent plaintiff claims that he should have been treated by Johnson and not other medical professionals, he has no valid claim. An inmate has no right to the doctor of his or her choice. *See, e.g.*, *Hamm v. Greer*, No. 06-1692, 2007 WL 4248490, at *4 (W.D. Pa. Dec. 3, 2007) (holding that prisoner had no right to be treated by a particular medical professional), *aff'd*, 269 F. App'x 149 (3d Cir. 2008); *Rivera v. Brown*, No. 85-6865, 1986 WL 5704, at *1 (E.D. Pa. May 15, 1986) ("Plaintiff does not have a constitutional right to choose which doctor would treat him.").

Having established that plaintiff has failed to prove any viable claim against Johnson, the sole named defendant, the Court could end its analysis here. For the sake of comprehensive review, however, it will also address any potential argument plaintiff may have raised about the adequacy of his healthcare in general.

Plaintiff highlights perceived insufficiencies in his course of treatment that he contends warrant liability. He strenuously argues that the treatment he received at Norfolk City Jail did not align with the instructions he received upon his discharge from Sentara Norfolk General Hospital.

[*See* Dkt. No. 26]. Specifically, he asserts that doctors at the hospital indicated his wound should be cleaned "every 12 hours." [Dkt. No. 12] at 4. By failing to comply with these instructions, plaintiff reasons, officials at the jail violated his rights. [*See* Dkt. No. 26].

Because plaintiff was a pretrial detainee at the time of the events in question, his claim is governed by the Fourteenth Amendment, not the Eighth Amendment. *See Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Functionally, however, courts within the Fourth Circuit have "traditionally looked to Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate indifference to serious medical needs." *Id.*

An Eighth Amendment claim for deliberate indifference to serious medical needs includes objective and subjective elements. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The objective element requires a "serious" medical condition. *Id.* A medical condition is objectively serious when it is either "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

For the subjective element, the prison official must have acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective state of mind required is that of "deliberate indifference . . . 'to inmate health or safety.'" *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 834). Deliberate indifference requires a showing that the official "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178; *Parrish ex. rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) ("[D]eliberate indifference requires a showing that the

8

defendants . . . actually knew of and ignored a detainee's serious need for medical care.") (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001)).

Without question, the record supports a finding that plaintiff suffered from a serious medical condition—the self-inflicted gunshot wound to his thigh. The record does not, however, support a finding that any official at Norfolk City Jail was indifferent to plaintiff's needs. Plaintiff himself concedes that his wound dressings were changed fifteen times over the course of his thirty-two day stay at the facility. The record also reflects that plaintiff was seen at the medical clinic even more frequently. On the days plaintiff's wound dressing was not changed, it was inspected by a medical professional.

Plaintiff's claims are based upon no more than a disagreement with his course of treatment, something that does not support constitutional liability. *See, e.g., Irvin v. Alexander*, No. 7:09cv244, 2009 WL 3125708, at *3 (W.D. Va. Sept. 28, 2009) ("At the most, plaintiff alleges a disagreement between himself and the jail's doctors, and perhaps between the jail doctors and plaintiff's previous physician who scheduled him for surgery. Such disagreements do not give rise to any claim actionable under § 1983.").

Plaintiff also appears to blame jail officials for complications in his healing process. In his opposition brief, plaintiff claims that his leg swelled such that, "by late November early December the doctor determined it was infected." [Dkt. No. 26] at 6. As a result, plaintiff claims, he nearly lost his leg. *Id.* Although this is a very serious allegation, this alleged event occurred almost two full months after he was released from Norfolk City Jail. Jail officials cannot be held responsible for events that occurred so long after his release, particularly when there is no evidence that plaintiff's injury showed signs of infection during his time at the jail.

9

In his complaint, plaintiff raises several additional arguments that appear to be loosely related to his primary claim. For instance, plaintiff complains that he was forced to sleep in a top bunk. [Dkt. No. 12]. However, the record at summary judgment shows that LPN Angela Lepak recommended a bottom bunk for him during his initial health screening. [Dkt. No. 23-1 at 41]. There is no evidence in the record other than plaintiff's unsupported allegation that the recommendation was not followed. Plaintiff also complains that, due to his wound dressings, he was unable to shower for an extended period of time. [Dkt. No. 12]. In his opposition brief, however, plaintiff concedes that he was unable to shower for only ten days, not the "month" he claims in the complaint. *Compare* [Dkt. No. 26] at 4 *with* [Dkt. No. 12]. The record also shows that plaintiff's inability to shower was due to his wound, not the malicious intent of any official at Norfolk City Jail; indeed, plaintiff was able to wash himself in a "bird bath" fashion during this time and was ultimately provided a shower-friendly bandage. [*See* Dkt. No. 23-1] at 55.

Assuming arguendo these allegations to be true, such conditions do not constitute punishment and therefore do not support any viable claim for relief. *Howard v. Williams*, No. 90-0125-AM, 1991 WL 199872, at *2 (E.D. Va. June 4, 1991), *aff'd*, 952 F.2d 395 (4th Cir. 1992) (stating that inmate's ability to shower twice in fifteen days "was merely a temporary restriction necessarily imposed to maintain order," and while the conditions were undesirable, "the Eighth Amendment is not implicated in this case where there was a need for additional security measures and the period of inconvenience was short."); *Conaway v. Capasso*, No. CV RDB-17-3534, 2018 WL 3092166, at *6 (D. Md. June 22, 2018) ("That he was denied showers during the 17 days prior to his transfer to another pretrial facility does not, under the facts presented here, amount to imposition of an unconstitutional condition of confinement."); *Thompson v. Clarke*, No. 7:17cv00111, 2018 WL 4764294, at *10 (W.D. Va. Sept. 30, 2018) (finding that inmate's claim

that he did not shower for four, twelve, and seven days in a consecutive period did not allege a Fourteenth Amendment due process claim, as it was occasional and not an atypical or significant hardship compared to normal prison conditions).

## IV. Conclusion

For the reasons stated above, defendant's motion will be granted through an Order that will accompany this Memorandum Opinion.

/s/
Michael S. Nachmanoff
United States District Judge

August 23, 2022
Alexandria, Virginia